FILED

2013 Oct-29  AM 12:00
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

NEIL DAUGHERTY,                    )
                                   )
    Plaintiff,             )
                                   )       Civil Action No.
vs.                                )
                                   )       1:12-CV-00883-VEH
WAREHOUSE HOME FURNISHINGS         )
DISTRIBUTORS, INC., d/b/a          )
FARMERS HOME FURNITURE,            )
                                   )
    Defendant.             )

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE

Defendant (herein referred to as "Farmers") has moved the Court in two separate motions in limine to exclude plaintiff (herein referred to as Daugherty) from seeking to introduce evidence of (1) an investigation Farmers did into Daugherty and his store after he tendered his resignation, and (2) "me too" evidence regarding Farmers' alleged discriminatory treatment of other employees.[1]   Daugherty will respond to both herein.  As set forth below, Daugherty opposes the "Investigation"

---

[1] This has no bearing on Farmers' motions but should be cleared up: Farmers also states in both motions that Daugherty claimed that Farmers "discriminated against him because he had a black girlfriend and retaliated against him for making complaints of discrimination," but that his allegations about his "having a black girlfriend have been dismissed." (Both motions, pp. 1-2) It is unclear why Farmers would say this: Daugherty referenced his having had an African-American girlfriend in his resignation email, but he has never raised (nor dismissed) this as grounds for any claim in this lawsuit.

motion entirely and previously filed his own motion on that subject (Doc. 37). Daugherty opposes the "me too" motion partially as to the particular evidence Farmers lists and to the categorical request for exclusion as it relates to any item not addressed.  These will be addressed in turn.

## A.  <u>Farmers' "Investigation" Motion</u>

As discussed in Daugherty's motion in limine, after he resigned there was discussion with Farmers about his possibly staying on in another position.  Farmers seeks to introduce evidence that, after Daugherty's resignation, it conducted and inventory and audit of his store and subsequently performed an investigation into him.  Farmers claims the inventory showed significant shortages of cash and inventory, and that its investigation, based on interviews with store employees, showed that Daugherty had sold merchandise to customer Maurice Castleberry at substantial losses and received "kickbacks" from Castleberry, that Castleberry ran a prostitution business and Daugherty was his regular customer, and that Daugherty had a gambling problem.

Farmers contends that this evidence is admissible because (1) it is "after-acquired" evidence supporting the assertion that it would not have "re-hired" Daugherty and also would have terminated him, (2) that the audit and inventory results would have negatively impacted Daugherty's bonus, (3) that the real reason

Daugherty resigned was because of all of these shortages and misconduct associated with Castleberry, and (4) that Daugherty could not have suffered much emotional distress as a result of what Farmers did because he could have realized that the "gig [was] up" and that Farmers would discover his "illicit actions."   (Farmers' Investigation Motion, p. 8, Doc. 35)  None of these reasons is persuasive and the evidence is due to be excluded.

### 1.  After-acquired evidence: Daugherty's retention/termination

As to Farmers' claim that it would not have retained Daugherty had it known the results of the investigation, as set forth in Daugherty's motion on this subject, this is unfounded because his employment had been severed before it was even conducted.

Angela Mitchell, defendant's Employee Relations Manager, testified in deposition that she received Daugherty's resignation email.  (Mitchell Depo. 6, Doc. 19-7) She notified her supervisor, Executive Director of Human Resources Claudia Peavey.  (*Id.*)  The two of them called Daugherty to ask him about the substance of his email.  (Mitchell Depo. 6-7)  They told Daugherty that they accepted his resignation, that they would be investigating what he provided, and they asked him if he would be interested in "remain[ing] with the company" depending on the results of that investigation.  (Mitchell Depo. 10) Daugherty said that he would but did not

3

want to work under his supervisor, Randy Carroll.  (*Id.*)  Mitchell contacted people

in operations to see about Daugherty working under a different group manager.

(Mitchell Depo. 13-14)  On about August 19, 2011, Daugherty called Mitchell back.

(Mitchell Depo. 14)   She told him that she had not heard back from anyone in

operations, that they were in an "investigative process, and that a decision had not

been made." (Mitchell Depo. 15) Mitchell told Daugherty that he could "pursue other

avenues" if he needed to do so.  (*Id.*)  Daugherty told her that he needed to file for

unemployment, and she told him that she would process his termination.  (Mitchell

Depo. 17-18) Farmers processed Daugherty's "Termination Report" on August 22,

2011.[2]    (Employment Termination Report, submitted herewith)   According to

Farmers, the inventory of Daugherty's store was done on September 14, 2011, and its

"Store Investigation" was done on September 20, 2011.  (Farmers' Investigation

Motion, pp. 3-4)

　　　As argued in Daugherty's motion, by the time Farmers' alleged investigation

was completed there was no longer any opportunity for it to have made the decision

not to retain Daugherty because he had already told Mitchell that he needed to

---

　　　[2]Farmers consistently refers to the situation as involving whether Daugherty would be
"re-hired."  However, the evidence clearly shows that it was a matter of *retaining* Daugherty
rather than rehiring him because his employment was not severed until after Daugherty spoke
with Mitchell on August 19.

proceed with his unemployment application and his employment had been severed. Moreover, there is no evidence that Farmers actually *made* a decision not to keep Daugherty.  It cites the declaration of Claudia Peavy in support of this assertion. (Farmers' Investigation Motion, p. 4; Declaration at Doc. 19-9)  However, there is no passage in Ms. Peavy's declaration wherein she addresses such a decision.  In sum, there is no relevance to the evidence based on the claim that Farmers would not have retained Daugherty.

There is further no basis for the claim that Farmers would have terminated Daugherty had it known about these alleged matters.  "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would  have been terminated on those  grounds alone if the employer had known of it at the time of the discharge."  *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362-63, 115 S. Ct. 879, 886-87, 130 L. Ed. 2d 852 (1995).  Farmers has not previously asserted this claim and it has no evidence that it *would have* terminated Daugherty.

### 2.  Adverse effect on Daugherty's bonus

Farmers next argues that the "inventory shortage" and "problems on the audit" would have caused Daugherty's store to have made less profit, resulting in a lower year-end bonus for him after his resignation.  This unsubstantiated assertion is mere

speculation.  "Speculation or conjecture from a party cannot create a genuine issue of material fact." *King v. Henry*, 2011 WL 5877070 (N.D. Fla. Sept. 19, 2011) report and recommendation adopted, 2011 WL 5873380 (N.D. Fla. Nov. 23, 2011) (citing *Cordoba v. Dillard's, Inc.,* 419 F.3d 1169, 1181 (11th Cir.2005).  The evidence therefore should be excluded.  Daugherty would add that, should the Court find Farmers' argument here persuasive, it would only allow admission of evidence related to its inventory and audit and would not extend to its "investigation" and claimed evidence of Daugherty's alleged misdealing with Castleberry, gambling, and any other evidence other than that financial information.

### 3.  The "real reason" for Daugherty's resignation

Farmers next argues that the evidence supports the inference that Daugherty did not actually resign because of what he claims but rather because of what Farmers discovered in its investigation, in that Daugherty "realized that his store was going to be under increased scrutiny."  (Farmers' Investigation Motion, p. 6)  Again, this is pure speculation and supposition. There is no evidentiary support for it and it should be excluded.  *King, supra*.

### 4.  Daugherty's emotional distress

Farmers finally argues that Daugherty's claimed emotional distress was actually caused by his trepidation that the "gig [was] up" and that Farmers was going

to discover his "illicit actions."  Same story: pure speculation with no evidentiary foundation and should be excluded.

In sum, the reasons advanced by Farmers for admission of this evidence are unfounded.  It should be excluded.

### 5.  Additional reasons for exclusion

Before leaving this topic, Daugherty would incorporate arguments made in his motion in limine that, even if there were any relevance to this evidence, it should still be excluded under FRE 403 because (1) any probative value would be substantially outweighed by the danger of unfair prejudice to plaintiff, and (2) would cause undue delay and a waste time in the trial of the case because a "second" trial would develop with regard to the claims.  Daugherty would also incorporate his objections as to Farmers' exhibits that are hearsay.  At the very least, the evidence of Daugherty's alleged wrongdoing related to Castleberry and gambling from Farmers' investigation is highly inflammatory, prejudicial, and based on hearsay and should clearly be excluded.

In sum, Farmers' "Investigation" motion is due to be denied.

## B.  Farmers' "Me Too" Motion

Farmers concedes that evidence of "the treatment of the plaintiff, plaintiff's verbal complaints to Mr. Carroll and his resignation letter" are relevant.  (Farmers'

Motion, p. 4)  It argues, however, that evidence of "alleged acts of discrimination and/or retaliation beyond plaintiff's verbal complaint to Randy Carroll or his Resignation Letter" is inadmissible "me too" evidence.   Farmers specifies, as "example," the following evidence:

(1) Herbert Scott's feeling that store assignments were discriminatory;

(2) an unknown Store Manager allegedly making complaints of sexual harassment prior to plaintiff's employment;

(3) store manager Claudia Mitchell complaining about sexual harassment;

(4) store Manager Larry Davis being demoted because of his age and health problems;

(5) Juliette Cook being discharged and filing an EEOC charge after Daugherty resigned; and

(6) "Further, plaintiff testified in great detail about Janet Mitchell's Charge of Discrimination."

(Farmers' Me Too Motion, p. 3)

The evidence that Daugherty seeks to admit in the trial of this case regarding claimed discriminatory treatment against other employees, and its impact on Daugherty, is listed in Daugherty's "Factual allegations" in the Pre-trial Order. Daugherty claims that this discriminatory treatment of other employees, and the

8

various acts of retaliation from Carroll resulting from his complaints about it (regarding Lavon Carr and Janet Mitchell) and his resistance to it (regarding Juliette Cook's promotion), compelled him to resign.  As such, Daugherty does not contest Farmer's motion with respect to referenced items (1)-(4).  However, Daugherty does oppose exclusion of evidence regarding race discrimination by Randy Carroll against Mitchell and Cook, as well as any categorical exclusion of unspecified and perhaps unanticipated evidence of race discrimination against Carroll that may arise in the course of the trial.

Since the evidence is all being aimed at Carroll,[3] this is not a "me too" situation involving management employees other than the applicable decision-maker, as considered (but not excluded) by the Supreme Court in *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388, 128 S. Ct. 1140, 1147, 170 L. Ed. 2d 1 (2008) ("The question whether evidence of discrimination by other supervisors is relevant in an individual ADEA case is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case.") In situations as in this case involving the same decision-maker, "me too" evidence is

---

[3]With regard to Janet Mitchell (now Marshall), it is asserted that Lavon Carr made racist remarks and terminated Mitchell because of her race, but again this goes back to Carroll because of Daugherty's complaint to him about Carr and Carroll's adverse actions subsequently taken against Daugherty.

admissible under FRE Rule 404(b) to prove that person's motive and intent. *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1286 (11th Cir. 2008); *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341 (11th Cir. 2011).

Consequently, this evidence is relevant to prove Carroll's intent regarding the actions he took, not only with respect to the other employees but also his intent in his treatment of Daugherty in response to Daugherty's complaint about Carr and Mitchell and his effort to promote Cook. Further, the evidence is also relevant to show Daugherty's motivation in resigning as protected under Title VII and 42 U.S.C. §1981. In sum, the evidence is relevant and is due to be admitted.

Farmers also argues that such "me too" evidence must be based on a pattern and practice theory. (Farmers' Me Too Motion, p. 6) This is wrong and the cases cited by Farmers do not support the contention. *Jones v. Water Works Bd. of the City of Birmingham*, 2012 WL 2856651 (N.D. Ala. July 5, 2012), did not address the issue. *Id*. at *12, n. 5. *Brown v. Berg Spiral Pipe Corp.*, 2011 WL 3610646 (S.D.Ala. Aug. 17, 2011), merely cited without discussion *Lane v. Terry*, 2010 WL 2721896, *17 (N.D. Ga. June 4, 2010), which held that *Goldsmith* allowed "me too" evidence "where that evidence was offered to support a pattern and practice claim and to rebut certain defenses. [citation omitted.] However, unlike Goldsmith, this action does not include a pattern and practice claim." This was an erroneous reading of *Goldsmith*.

10

*Goldsmith* explicitly noted that the plaintiff there "offered the evidence to support his pattern and practice claim," but that "the district court later granted Bagby Elevator a directed verdict on this claim." *Goldsmith*, 513 F.3d at 1285.  The Eleventh Circuit nevertheless held that the "'me too' evidence was still admissible, under [FRE] Rule 404(b), to prove the intent of Bagby Elevator to discriminate and retaliate." *Id.* at 1286.  Consequently, a pattern and practice theory is not required.  Accord *Smith, supra*.

Further, Farmers' citation of other cases from this District is misplaced.  It cites *Hamilton v. Coffee Health Grp.*, 2013 WL 2635304 (N.D. Ala. June 6, 2013), for the proposition that "me too" evidence is "inherently 'suspect.'"  (Farmers' Me Too Motion, p. 5)  However, *Hamilton* actually quoted *Bell v. Crowne Management, LLC*, 844 F.Supp.2d 1222, 1236 (S.D. Ala. 2012), which simply cited *Goldsmith* for the proposition that "[t]o be probative, the other incidents must implicate a common decision maker." *Id.* at 27-28.[4]  It further cites *Andazola v. Logan's Roadhouse, Inc.*, 2013 WL 2355350 (N.D. Ala. May 24, 2013), that "more often than not, 'me too' evidence is not admitted at trial." *Id.* at *2.  However, the Court in *Andazola* actually *allowed* plaintiff's evidence of discriminatory (sexual harassment) treatment of other

---

[4]This was actually incorrect as *Goldsmith* affirmed allowance of evidence of racial comments from defendant's owner, despite the fact that he was not involved in any of the decisions.  *Goldsmith,* 513 F.3d at 1289-1290.

employees as evidence of the intent of the alleged harasser, citing *Goldsmith*. *Id*. at *5.

Finally, Farmers' argument under FRE Rule 403 that the probative value of the evidence is substantially outweighed by undue prejudice to it is unfounded.[5]   Its argument here is based on the claim that the evidence is "far too attenuated" from Daugherty's claim and will result in "mini-trials" prejudicial to Farmers and confusing to the jury.  This is wrong.  The evidence directly supports Daugherty's claim, factually and legally, and is critical to his case.

In sum, Farmers' "Me Too" motion is due to be denied.

Respectfully submitted,

s/ Adam M. Porter
Adam M. Porter
Attorney for Plaintiff
Adam M. Porter, LLC
2301 Morris Avenue, Suite 102
Birmingham, Alabama 35203
(205) 322-8999

---

[5]Farmers also argues that Daugherty should not be allowed to testify about other claimed acts of discrimination he "heard about."  (Farmers' Me Too Motion, pp. 10-11).  Daugherty would agree that any evidence subsisting of only "I heard this" should not be allowed as hearsay. Beyond that, the Court should reserve any ruling to trial to consider other evidence or circumstances of admissibility as to any such claim.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 28, 2013 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to and that there are no non-CM/ECF participants in this case.


<u>s/ Adam M. Porter </u>
Attorney for Plaintiff

13